May it please the Court, Robert LeBou for the appellant, Fleischer Studios. May I reserve two minutes for rebuttal. Thank you, Your Honor. Fleischer Studios appeals from two decisions of the District Court which, taken together, stripped Fleischer Studios of copyright and trademark rights that it had enjoyed for many, many years. In the character Betty Boop, instead, the District Court granted summary judgment to the defendants, and we submit that the decisions below strayed from the core purpose of intellectual property law, which is to stimulate creativity by rewarding it. Instead, the decisions below rewarded the defendants, Mr. Valencia and his companies, who have created nothing. The defendants come to this Court arguing that the character Betty Boop is in the public domain and therefore presumably open to the world to exploit, while simultaneously they are out in the marketplace selling and profiting from licenses for the exploitation of the same Betty Boop. The single argument that the defendants advance in this Court as to why Betty Boop is in the public domain requires this Court to apply an extraordinarily harsh version of the Indivisibility Doctrine, which was largely abandoned by the courts even before it was formally abandoned in the 1976 Copyright Act. The defendants are claiming that the 1955 contract between Paramount and UM&M, which purported to sell and assign all right, title, and interest in the so-called early Paramount films, including, and I quote, all copyrights subsisting therein was actually defective, that it didn't do what the parties said it was doing, namely transferring ownership of those copyrights, that it wasn't what the parties said it was. Sotomayor. Counsel, I have a couple of questions about that. I find this case very difficult, and I may be getting facts and law wrong, so please correct me. It seems to me that at the trial court, the defendants did not challenge this link in the copyright chain. They didn't make the argument at the district court that they're making to us. Is that a correct understanding of the record? And if so, should we even be considering their argument here? Your Honor, I agree with your observation that this was not argued below. I would further point out that Judge Cooper made a finding diametrically opposed to what the defendants would argue in this Court as to the legal effect of the 1955 agreement. I do think the defendants can attempt to salvage the result below by arguing matters, even if they were not argued below. But I think the position they're advancing to this Court, frankly, is outlandish. Well, let's leave aside the characterization. I just want to be clear. It wasn't this specific issue was not litigated or was not part of their claim in the summary judgment, as I understood. That is correct, Your Honor. Okay. The second issue that I have with this is a question about what happens when there is a copyright for something like a photo play. It was my understanding that under the 1976 Act, when there's a copyright for a photo play, that the characters within it also are generally part of the copyrighted material. Is that a correct understanding? That is correct, Your Honor, and that is the same understanding that obtained under the 1909 Act. I think the Disney v. Air Pirates case was the character case under the old Act. And that actually gets to the heart of the issue on the 1955 contract, because if no one in this Court is quarreling with the finding below that the character of Betty Boop is embodied in what we call the early Paramount films, the ones which, among others, were the subject of the 1955 transfer. After Paramount made that assignment of copyright in the films, there is no way that Paramount could have renewed protection for the Betty Boop character, because you can't have a disembodied character copyright. It only exists if it is. Because there was nothing that they retained after having transferred the copyright to the photo play with the character embedded in it. That's correct, Your Honor. You're saying there's nothing left. And so that's the conundrum. If, as the defendants would argue here, there was a defective assignment because the character rights were reserved, that just guarantees that there would have been a forfeiture. U.M.N.M. could not successfully renew or extend the character rights because of the allegedly defective transfer, and Paramount would have had no way to do so because they didn't own the films anymore. If your argument is right, then aren't you just saying there's no way the defendant can prove a chain of rights from Paramount through the various entities to Fleischer? No, Your Honor. I understand your question. We are arguing as plaintiffs that there was a chain of title connected in the early films through from Paramount to U.M.N.M. No question. You have to get the chain of entitlement. Maybe I misunderstood your argument, but weren't you saying that if it is the way it was below, then there would be no rights to U.M.N.M., there would be no rights to Paramount. It would be an unfortunate deal. But how does that help you? If that, in fact, occurs, then you just demonstrated no chain of authenticity can be made. I think it's relevant here because the law at war is a forfeiture as much here as in any other area. As we've tried to demonstrate in our reply brief, quoting Judge Hand and so many other cases, the courts would not permit a hyper-technical application of the indivisibility doctrine to procure a result that the parties could not have intended, which is to create a situation where nobody could renew the copyright, thereby guaranteeing. So as I understand your argument, it is that in 1955, Paramount, which had the copyright to the photo plays and the character, transferred those rights to U.M.N.M. Yes. And then the other disputed link, which I think has been disputed all along, is whether U.M.N.M. then transferred those rights to the plaintiffs. Yes, Your Honor. If I may, let me address the remainder of the chain of title, starting with U.M.N.M. And I would simply refer to two, I think, very important points. One is the recital of the entire chain of title in the 1997 settlement agreement between Republic and Fleischer Studios, which in one fell swoop renders irrelevant a lot of the evidentiary quarrels that we've had with the district court. That is something that is not even mentioned in the defendant's brief and clearly is admissible and prima facie evidence as a recital concerning rights and property and, again, not contested in this court by the defendants. Secondly, I would draw the court's attention to the admission made in the record below this is at record pages 137, 38, in which defendants admitted that Republic transferred to Fleischer, and I quote, whatever Betty Boop character rights it arguably possessed, close quote. And because Republic at that point owned the renewal copyrights to the early Paramount films, in which the character subsisted, it necessarily, according to the defendant's admission, possessed the, had the right to transfer and did transfer whatever rights it had in the character. I read that statement as not admitting there was any rights transferred, but just saying whatever rights were transferred were. That's right. Yeah, but he isn't making any, there was no capitulation on the point of the brief. His contention is that the rights lapsed upstream. Yeah. Many years before, but at the same time he proceeds that. Nothing was transferred. You said something was transferred. Right. That the grant in 97, the settlement was broad enough to convey the rights on which we're suing here. And actually, Your Honor, if you read that 97 agreement, it's perfectly clear that the parties understood that the merchandising rights, the rights at issue here, the rights on which we're suing, were intended to be located with Fleischer Studios. Your opposition is going to tell us that the 97 Republic stipulation only talked about films, not characters, and therefore you really got nothing to help you for this case. What's your response to that? Yes. Two things, Your Honor. I refer the Court first to paragraph 5, then to paragraph 4 of that agreement. Paragraph 5 grants an exclusive license to Fleischer Studios to exploit the images from the photo plays for the purpose of merchandising. And that's really what merchandising of a character is. You have a visual character, which is identified by its image. You're taking that image and you're turning it into toys and dolls and coffee cups and T-shirts and so forth. I would also refer, Your Honor, to paragraph 4 of the same agreement in which Republic agreed to execute and deliver any further instruments that may be required to solidify the merchandising rights in Fleischer Studios. So to the extent that there's any question as to the breadth of the rights granted in 1997, I think it's clear that the intent of the parties was to solidify all those rights. And then there's also the part that you and I discussed, which is that the copyright of the photo play encompasses ordinarily the copyright of the character itself. I agree with that. Yes, Your Honor. My time is short. But I'd like to turn to the trademark issues, if I may, which are equally important here. In order to... Would you, before you... Let me ask you a question about that. Please. Neither side cited Job's Daughters. I read Job's Daughters and it seemed to me it applied. Why wasn't it cited? Why wasn't that a case that was significant that might well answer all the questions? Your Honor, I apologize. I'm not familiar with it. Okay. Thank you. I'm sorry. I can't. I can't help you. Turning to the trademark issues, in the course of years, in order to further protect its rights, Fleischer Studios registered both image and name trademarks with respect to Betty Boop. When it registered those trademarks, no one contested Fleischer Studios' right to do so. There were several clear legal errors that the district court made with respect to the trademark issues. First of all, the court appeared to misunderstand the legal effect of registration of a trademark. The court acknowledged that registration was prima facie evidence of validity. But at the same time maintained that the plaintiff had submitted no evidence of secondary meaning. Those two statements cannot coexist. The essence of validity of a trademark is that it has a source identifying function. That's what the Patent and Trademark Office looks for when they examine an application and when they grant the registration. They are saying that they are persuaded that this mark has secondary meaning, that it has a source identifying function. I may be surprised, because you're going to be able to cite me a case and show I'm wrong, but in trademark cases I've always felt, at least as always happened, that there's been some confusion of origin evidence that's been placed before the district court. In a trademark, don't you have to show the confusion of origin in order to gain your point, to be successful? Confusion is obviously an infringement factor. The first question is, does the claimant own the trademark? Either you have a registration, and we contend that our registrations are incontestable, which makes them even stronger, and the defendant admitted that they were incontestable in its briefs below. If you don't have a registration, you have to prove secondary meaning, and there are ways to do that. One way or another, you have to show you have ownership of the trademark, and then you go on to the infringement factors. The district court never got to the infringement factors here, because she held that there was no ownership of trademark, even though we have registered trademarks. Was there any evidence of confusion as to origin in the case? I think, Your Honor, there was not direct evidence in the sense of a witness on the stand who said, I was confused. Don't you need that? No, Your Honor. Respectfully, you do not. I think what you need to do is to go to the so-called sleek craft factors, a multi-factor test that this Court has enunciated, which includes such considerations as the strength of the mark, the proximity of the goods, the similarity of the marks, and so forth. We certainly argue that. But you may want to take a look at Joe's daughter. I will. I see my time is up. It is. We took some of it with questions, and when the time comes, we'll give you a short rebuttal opportunity. Thank you, Your Honor. And while you're waiting, I'll ask you to think about answering this question. I thought the Fleishley family had sold the ownership to all of this years ago. May I respond? No, no, no. Yes, please. Go ahead, because otherwise it won't be rebuttal. Please, go ahead. I'm sorry. Judge Mills, there's no question that in 1941 the Fleisher family sold the rights to Paramount. And that's why, in more recent years, Fleisher Studios has gone around making agreements with the various potential rights holders in this somewhat complicated chain of title to solidify all the rights in the new Fleisher Studios. They had to buy it back, basically. Essentially, we made a settlement with Harvey Films, which was the recipient of those reserved character rights from Paramount from the 1955 agreement. We made the settlement with Republic. We registered the trademarks. So it comes full circle. All roads lead to Fleisher. To borrow a phrase. Now, Mr. Winter, sorry to have you up and down. That's okay. May it please the Court, Doug Winter of the Ball Law Firm on behalf of the defendants and appellees. I'd like to first start with the point raised by Judge Graber at the beginning as to whether the issue particularly raised by the district court or suggested by the district court regarding the 1955 agreement was raised below. It wasn't raised precisely as highlighted by the district court below, but it was addressed in this fashion. I argued, and we argued, that the transfer of the 1955 between Paramount and UM&M was a transfer of cartoon rights only, not character rights. And in the record before the court, Fleisher's counsel agreed expressly that What part of the record should I be looking at for that? The first place would be supplemental excerpt of the record at page 44, where in briefing on summary judgment, we argued that UM&M only acquired cartoon copyright from Paramount, not separate character protection. Then at oral argument on SER, or supplemental excerpt of the record at page 35, this is Fleisher's counsel saying, Let's take the first chain counsel discussed. Paramount to UM&M to MTA to Fleisher Studios, Inc. Counsel points out that those were cartoon grants only. And that's correct. That is, in fact, what occurred. And that's what the district court pointed out in her ruling. The district court pointed out Well, I'm not really sure. I'll go back and look at that. I'm not sure I understand what that means, cartoon rights only. But do you agree or disagree with the proposition that ordinarily the copyright of a photo play includes the copyright of the characters in it? The 1978 Walt Disney case being a good example. Yes, as long as the character becomes sufficiently delineated to merit separate protection under the Copyright Act, which in this case the district court determined occurred as of no later than May of 1931, Betty Boop was separately protectable. However, under the That's not the answer to my question. I think. Maybe I just don't understand the answer. Let me elaborate. I think I didn't quite get to the end of the answer. And that is that, yes, therefore, if a character is protectable within a photo play, a transfer of that photo play would transfer those copyrights that exist in the character. However, grantors do not have to transfer those rights. And in this instance, Paramount expressly carved out the character rights from that transfer. So your position, if I understand it correctly, is number one, we did raise this issue sufficiently below to be allowed to argue it here. And number two, we then and now read the 1955 agreement to retain all rights to the character of Betty Boop that were not then transferred. Is that your position? That's absolutely correct. The excerpts of the record of page 288, which is the actual relevant portion of the 1955 agreement, it states expressly, Paramount is not granting or assigning to UM&M the characters in any of these photo plays, the character copyrights in any of these photo plays, the production rights in the characters. Which page is this? I'm sorry. I'm sorry. It's page 288. All right. I'm with you. It's not transferring the production rights in the characters. It's not transferring the rights to use the characters. And again, even in a salvo at the end, to make it explicitly clear, you have the right to use these characters as they are depicted, as they are embodied in this film only. We retain the character rights. There can be no question as to what that agreement said and what it meant. Now tell me, counsel said that they were granted merchandising rights and these allowed them to exploit the character. Counsel was referring to a settlement stipulation in 1997 between Republic and Republic didn't have the right to grant to Fletcher at that time. And that's because based on this transfer, it never had character rights. Okay. So you say it never got to Republic. Absolutely. It never got there. Stipulation between themselves, what they agreed they each had, has no bearing upon the world or my clients. And to just address a single point that was made at the beginning about copying, as this Court well knows and the Supreme Court has announced numerous cases, material that's in the public domain is free to be copied. There's policy to copy that. It belongs to us. It belongs to everybody. Now, I want to get back to the 1955 agreement because the Indivisibility Doctrine of the 1909 Act, which concededly governs all of the transactions in this case. Well, let me interject here. Does any single entity own the copyright interest in the character Betty Boop? No. The character Betty Boop went into the public domain when in 1950 I'm sorry, 1958 or 59 depending on the date that the 28 years from the registration of either Silly Scandals or Dizzy Dishes 28 years after that when Paramount, who had the right to renewal failed to renew that copyright registration Betty Boop went into the public domain. And we know that because the District Court made the determination, I think correctly as to when Betty Boop became separately protectable as a character. And when the Court determined that that was in May of 1931 that means that the earliest work in which Betty Boop appeared as a protectable character is the start date. And under the 1909 Act the Indivisibility Doctrine, it's not a harsh result it was the law. The law was that if you transferred anything less than a full transfer of all your copyright interests it was a license. It's not harsh. It was the law. Gardner v. Nike, this Court held clearly the international film case which I cited is exactly on point. It involved an almost exactly similar situation where a mere licensee who had only the right to display the films but didn't have character rights couldn't renew the character rights because it never got that. It was only a mere licensee. It had the right to display the characters only as they're embodied in the film themselves. Now that point was raised by the District Court in the lengthy copyright ruling and wasn't even addressed in the opening brief by Fleischer and I find it interesting that now we heard just at the last few minutes of argument here that they now want to go back and use one of the three other chains of title that they expressly abandoned in this appeal. At the beginning of this case they argued four chains of title. The one we've been talking about which was the Paramount, UM&M then to MTA and Republic to Fleischer there was the Paramount to Harvey to ultimately ending up with Fleischer and then the third was Paramount to CBS ultimately ending up with Fleischer and then the fourth was arguing that renewal rights in Betty Boop booklets which were created after in 1932 were renewed by Max Fleischer. Recognizing as they must once the District Court determined that the character became separately protectable as of May of 1931, they abandoned the three other chain of title theories. Now that they realized in having to squarely face the 1955 agreement which carved out the copyright transfer and therefore became a mere license they argue well of the harsh results. There are some cases that have said look to the intent of the parties. It really was a grant of all rights. It wasn't a mere license. Well, in any event Paramount retained a contractual right to the character Betty Boop and it's okay anyway because we got it through Harvey. Well, number one, they've already abandoned that chain of title and number two, that wouldn't help them anyway because the transfer of character rights to Harvey involved the Betty Boop and her gang booklet which was created after the Dizzy Dishes and Silly Scandals movies and therefore was merely a derivative work. The only thing that would be protectable in that transfer would be the incremental changes that Betty Boop made, if any, from the Dizzy Dishes cartoon to the booklet. So we're now back at yet another moving target. We're now back at a new chain of title theory and it just doesn't hold water. All this being said, the district court was right anyway. The district court raised the issue in the express language issue in her order but got it right on the chain of title. Would you point to the part of the order that you were talking about? I'm not sure what you're referring to. I'm sorry? I was unsure what you were referring to in the district court's decision. Oh, that would be Bear with me, I'm sorry. It's the copyright order and it is in bold It is at page, actually for the record page 62. It begins actually on page 61, footnote 17, a very lengthy footnote, but the relevant language goes on to page 62. All right. Thank you. And so back to the point I was making is that the district court got it right in the first instance anyway, just examining the chain of title. The evidence that the plaintiff submitted in support of UM&M becoming NTA is inadmissible. There's no show of any abusive discretion. Let me ask you a question about footnote 17 because in answer to my questions earlier you said that these arguments were raised to the district court. At the close of footnote 17, the court talks about things  That's correct. Is that accurate as to what had not been argued? It's right in this sense. The argument that the indivisibility doctrine under the 1909 Act caused the transfer to become a mere license, which is exactly what the court addresses at the very end there, was not articulated except it was addressed in some supplemental briefing on the motion for reconsideration. But in text the court says that UM&M was the legal owner of the renewal right. I'm sorry? Is your argument consistent with what's on the text in the text part of page 26 of the court's order saying that UM&M was the legal owner of the renewal right? That's correct. UM&M because of the doctrine of indivisibility under the 1909 Act, the law in effect at that time could not validly renew. Okay. But that's what the district court says here. That's correct. And so your argument is that that's wrong. You know, the court here is saying neither party advances arguments regarding the effect. I know. I'm looking at page ER62. I'm not making a very clear question here. Line 8. Okay. Yes. Let me try to know the question. Okay. The court there was addressing an argument made by the defendants below that the language of the transfer didn't mention renewal rights. It didn't expressly mention renewal rights. And the district court said under the case law, the court can look beyond the four corners of the agreement to determine whether there was an intention to grant renewal rights. And under that general body of law, which I believe the court cited Rohauer in the previous page. Okay. I understand your position. Thank you. So in any event, as to the chain of title, the one that's actually being advanced in this case, the evidence is clear. The court correctly did not consider the inadmissible evidence on those chain of title. It's addressed in my brief. I don't want to rehash that. As to the trademark issue, a couple of issues that were raised. Number one, no survey evidence. Doesn't mean that there has to be survey evidence in every case to establish secondary meaning. There was none in this case. And an inference can be raised that a party that has the wherewithal to submit such a survey and doesn't, doesn't have evidence of secondary meaning. The evidence of secondary meaning in this case came exclusively from the declaration of the plaintiff's president, who concluded that essentially the what the court said, I'm sorry, Mr. Fleischer said was that the name and likeness of Betty Boop possesses a valuable goodwill and are well known to the public as identifying products and services that are authorized by Fleischer Studios and its exclusive licensing agent. Well, that's the heart of the matter in any trademark case. And that testimony can't substitute for evidence of actual secondary meaning where a consumer, where the mark evokes in a consumer Fleischer Studios, although they don't have to know who the name is. It can be an anonymous source, but it has to evoke an association with the trademark owner. There just was no evidence of that in this case. And the district court aptly noted that that testimony is inadmissible conclusory statements in any event. I don't suppose you stumbled across Job's Daughter's one. I wish I had. It's only 30 years old. It's a nice case. I think before I get to my office I will. You didn't cite Dastar either, Judge Scalia's. Oh, Dastar, we did below. The district court found that the Daystar case was not on point. And while I respectfully disagree, I didn't think it would advance our arguments in any meaningful way by rehashing that argument on appeal. All right. Thank you, counsel. Okay. Mr. LeGue, you may have two minutes for rebuttal. Thank you, Your Honor, and very briefly. The 1955 agreement requires construction as to its legal effect. The Court has a very clear choice. You can hold that there was a forfeiture, or you can hold, as many courts have done in at least roughly similar situations, it was a good assignment with a reserved contractual right in the grand tour that, as Judge Cooper found below, does not undermine the ability of the transferee, the assignee, that is, to renew the copyright. And that's what happened here. The renewal date was barely three years after the making of the contract. It's inconceivable that these two companies would have intended to work a forfeiture of these valuable rights. I'd just like to show the Court, and this is some of the merchandise in question. I don't know if you can see it from there, but this is the original, which is shown in photographic form on page 429 of the record and on page 27 of our reply brief. It's actually very clever. The backing, this is defendant's merchandise. The backing, the cardboard backing, is a reproduction of the movie artwork. And then they've got the, in plastic, they've got the little Betty Boop doll. I don't know if you can see it from here, but maybe you can on page 27. The doll is not the image of Betty Boop on the poster. There's a complete disconnect between the two. Even more interestingly, notice how they've contrived to put the name Betty Boop, which was part of the original artwork, across the top so that anyone who's walking down the aisle in the drugstore, they immediately see Betty Boop. That's why they're going to buy this. We have a registered trademark in that name. If we didn't have a copyright, maybe they could put out something like this and call it Mary Jones or something like that. But, you know, in terms of the trademark, they can't call this Betty Boop. Unless the Court has any questions, I thank you for your time. Thank you, Counsel. We appreciate the arguments that both of you have brought to us today. The case is submitted and we'll take about a ten-minute recess.
judges: Mills, Wallace, Graber